UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 23-MJ-153 |
| : | |
| SAI VARSHITH KANDULA, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRETRIAL DETENTION**

The United States of America, by and through the U.S. Attorney for the District of Columbia, submits this memorandum in support of the Government's motion for pretrial detention. The Defendant should be detained pending trial pursuant to: 18 U.S.C. §§ 3142(e)(3)(C) (rebuttable presumption in favor of detention for certain offenses, including 18 U.S.C. § 1361); 3142(f)(1)(A) (crime of violence); and 3142(f)(2)(A) (serious risk of flight). The Defendant's actions on May 22, 2023 – which included traveling from St. Louis, Missouri to Washington, D.C., renting a large U-Haul truck, and crashing the U-Haul truck into barriers while attempting to gain access to the White House, all for the express purpose of seizing power and potentially harming the President of the United States – demonstrate planning, determination, and resolve. The Defendant currently stands charged by complaint with a violation of 18 U.S.C. § 1361, depredation of property of the United States, where the damage exceeds $1,000. The United States requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention. As set forth below, there are no conditions, or combination of conditions, which would ensure the Defendant's presence at trial or the safety of the community if he is released.

**Principles Governing Requests for Detention**

Under the Bail Reform Act ("BRA"), 18 U.S.C. §§ 3141–3156, a detention hearing shall be held to determine whether any condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, when the government moves for a detention hearing and the case involves a crime of violence or an offense listed in § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed. 18 U.S.C. § 3142(f)(1)(A). In the present case, the Defendant is charged with depredation of government property in excess of $1,000 pursuant to 18 U.S.C. § 1361, which is an offense listed in 18 U.S.C. § 2332b(g)(5)(B), and for which a maximum term of imprisonment of 10 years or more is prescribed.

18 U.S.C. § 2332b(g)(5) defines the term "Federal crime of terrorism" as an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of 18 U.S.C. § 1361 (among other crimes). *Id*. Under this provision, upon motion of the government, a detention hearing must be held. 18 U.S.C. § 3142(f)(1). At that hearing, subject to rebuttal by the defendant, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community, if the judicial officer finds that there is probable cause to believe that the person committed the offense. 18 U.S.C. § 3142(e)(3). The facts of this case support the conclusion that the Defendant's actions were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. This results in a rebuttable presumption in favor of detention.

In addition, felony depredation of government property is a crime of violence. For purposes of the bail statute, as relevant to these offenses, a crime of violence is defined as "an offense that has an element of the use, attempted use, or threatened use of physical force against the person or

2

property of another," if that crime is punishable by ten years or more in prison. See 18 U.S.C. § 3142(f)(1)(A) & 16. Section 1361 of Title 18 of the U.S. Code meets those requirements, as it is punishable by ten years if the property damage was greater than $1,000, and its elements include the use of physical force against the property of another. *See United States v. Ahmed Salimfaraj Abukhatallah*, 316 F. Supp. 3d 207, 213 (D.D.C. 2018) (Cooper, J.) (holding that destruction of government property under a substantially similar statute, 18 U.S.C. § 1363, satisfies a substantially similar elements clause statute to qualify as a crime of violence).[1]

As a third basis for a detention hearing, under the BRA, a detention hearing must be held at the government's request if the defendant poses a serious risk of flight. 18 U.S.C. § 3142(f)(2)(A). When the government seeks to detain a defendant on the ground that the defendant is a risk of flight pursuant to 18 U.S.C. § 3142(f)(2)(A), the government must demonstrate the defendant's flight risk by a preponderance of the evidence. *United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996). A judicial determination that a defendant should be detained pending trial on the ground of community safety must be supported by clear and convincing evidence. *United States v. Smith*, 79 F.3d 1208,1209 (D.C. Cir. 1996).

When the government makes a motion for detention, the analysis proceeds in two steps. First, the judicial officer must undertake the threshold question of whether a detention hearing is appropriate. *See United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019). In cases where the government's request for detention is based on the type of offense alleged, this entails determining whether the alleged crime in fact fits under one of the categories enumerated in 18 U.S.C. § 3142(f)(1) – for example, whether the crime is a "Federal

---

[1] There is contrary case law from the 4th Circuit Court of Appeals as to whether 18 U.S.C. § 1361 qualifies as a crime of violence. *See United States v. Yonathan Melaku*, 41 F.4th 386 (4th Cir. 2022) (holding that § 1361 does not qualify as a crime of violence for purposes of 18 U.S.C. § 924(c)). In the present case, the Court need not base the presumption of detention on 18 U.S.C. § 1361 qualifying as a crime of violence, as the fact that the statute is enumerated as a Federal crime of terrorism provides the same presumption of detention.

3

crime of terrorism." *See Singleton*, 182 F.3d 7. For cases where the government requests detention based on flight, the Court must determine whether the "confluence of circumstances" is sufficient "to establish that [the] case presents a serious risk of flight justifying a detention hearing." *United States v. Sagastume-Galicia*, No. 19-287 (BAH), 2020 WL 2486423, at *2 (D.D.C. Apr. 22, 2020). "The decision whether to hold a hearing occurs is based on even less information than a decision to detain or release: a detention order is based on a hearing, while an order to hold a hearing is based on a proffer of what the hearing might establish." *Singleton*, 182 F.3d at 12.

Once the Court has affirmatively answered the first inquiry into whether a detention hearing is warranted (which was accomplished at the Initial Appearance in this case on May 24, 2023), the Court must then hold a hearing and determine whether it can fashion conditions to assure the safety of the community or the defendant's appearance as required. 18 U.S.C. § 3142(f). Whatever the basis for detention, the BRA's plain language does not limit the Court's consideration of the appropriate factors under section 3142(g). Indeed, it is exactly the opposite: section 3142(g) directs that judges "shall" consider the "available information concerning:" (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

At a detention hearing, the government may present evidence by way of a proffer. *See Smith,* 79 F.3d at 1209-10; *United States v. Roberson*, No. 15-CR-121, 2015 WL 6673834, at *1 (D.D.C. Oct. 30, 2015). At the hearing, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *Smith,* 79 F.3d at 1210. Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United*

4

*States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210, see also *Williams*, 798 F. Supp. at 36.

### Factual Proffer of the Evidence Supporting the Charges

On Monday May 22, 2023, at approximately 9:35 p.m., a United States Park Police (USPP) officer was patrolling in a stationary police vehicle near H Street, Northwest between 16th Street and Jackson Place, Northwest and observed an orange and white in color U-Haul box truck (the "U-Haul") traveling eastbound on H Street. The operator of the U-Haul, later identified as the Defendant, turned onto the H Street walking entrance to Lafayette Square, close to 16th Street. In doing so, the Defendant drove onto the sidewalk, sending multiple pedestrians running from the scene in apparent fear. The USPP officer observed the U-Haul strike the metal bollard barriers that prevent vehicles from entering Lafayette Square, north of the White House grounds. As the U-Haul initially turned towards the metal bollard barriers, the truck almost hit two individuals who were standing next to a park bench as depicted in **Figures 1**, **2** and **3**. **Figure 4** depicts the U-Haul after the first impact.



*Figure 1, showing the U-Haul prior to the turn and the pedestrians.*



*Figure 2, showing the pedestrians as the U-Haul drives onto the sidewalk.*



*Figure 3, showing the pedestrians almost being stuck by the U-Haul.*



*Figure 4, showing the first impact.*

After striking the barriers, the U-Haul backed-up in reverse, and then lurched forward, striking the metal barriers a second time.


*Figure 5, showing the moment before the second impact.*


*Figure 6, showing the second impact.*

The second impact shook the chassis of the U-Haul. At the same time, multiple pedestrians fled the scene by running away from the U-Haul in apparent fear. The second impact disabled the U-Haul, which began smoking from the engine compartment and leaking fluids. The Defendant exited the driver's side of the vehicle, went to the back of the U-Haul, and removed a red and white flag with a Nazi Swastika in the center from a black backpack he was carrying. The Defendant was quickly detained on scene by law enforcement.



*Figure 7, showing the Defendant exiting the U-Haul immediately after disabling his vehicle.*



*Figure 8, showing the Defendant exiting the U-Haul with his Nazi Flag.*



*Figure 9, showing the Defendant with his Nazi Flag once he was ordered down by the USPP officer.*

While detained, the Defendant indicated that he was trying to get to the White House. The Defendant was arrested and transported to a USPP station. No weapons or ammunition were found on him. Later that evening, specialized law enforcement units responded and determined no

explosives were present in the U-Haul.

After arriving at the USPP station, the Defendant consented to an interview with agents of the United States Secret Service "USSS." In response to questioning, the Defendant told agents that he flew into Washington, D.C. from St. Louis at approximately 8:00 p.m. that evening on a one-way ticket. Upon arriving at Dulles International Airport, he rented a U-Haul from a nearby location and drove directly to the White House. The Defendant stated that his goal was to "get to the White House, seize power, and be put in charge of the nation." When agents asked how the Defendant would seize power, he stated he would "Kill the President if that's what I have to do and would hurt anyone that would stand in my way." The Defendant made clear in the interview that by "the President" he meant the President of the United States. The Defendant said he had been planning for six months.

The Defendant stated that his actions at the White House had been successful because his intention was to send a message to us. When asked what the Defendant meant by "us", the Defendant stated a message was meant to be sent to all organizations like the Secret Service. The Defendant added, "either way, whether I got into the White House or not, my message was received." The Defendant was asked if he knew how dangerous his actions were, and stated that he knew he would be arrested, but his "book" would get to those who needed to see it.

The Defendant described possessing a "green book" which contains his thoughts in writing. The Defendant stated he eventually started writing about his plans to enter the White House, and what he would accomplish if he was in charge. When asked about the flag he showed on the scene, the Defendant stated it was a swastika. The Defendant stated he purchased the flag online, because "Nazi's have a great history." The Defendant was asked to elaborate on what he favors about the Nazi's to which he stated that he admires their authoritarian nature, eugenics, and their world order. When asked if he looks up to any leaders, the Defendant answered "Hitler, because he was a strong leader."

The damage caused by the U-Haul to the metal barriers, which are located at the intersection of H Street and 16th Street, Northwest, included impact damage to the barriers, requiring the need for an engineering inspection; scraping and paint loss that will require repainting; and cleanup of fluids leaked from the U-Haul after the vehicle was damaged by the impact, as well as repairs to the masonry. The cost to repair this damage – to property that belongs to the United States – is in excess of $1,000.

The recovered "green book" contained entries about harming family members and other individuals. In addition, the book contained the following passage, which appears to be a planned speech for after the Defendant had seized power:

> My fellow citizens of United States, ~~and res~~ I shall like to start of this broadcast by saying that this moment of history what has come up at this time during this takeover of this nation by our movement, this movement will not only extend within our nation but to the rest of the world as you will see pretty soon. As I am familiar with the [unknown] of this country being a democratic nation, and this will no longer be the case. There shall be consequence if civil unrest happens. ~~To make it clear~~ Any opposition will be met with death penalty to make it clear: (kill president) As you have seen, we will declare martial until the situation has been [unknown]. We will rebuild this world, and put a new system in place once the objective has been achieved. Sieg hail.

It is clear from the Defendant's own words that the Defendant's acts were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

### No Condition or Combination of Conditions Will Reasonably Assure Community Safety or the Defendant's Appearance in Court

1. **Nature and Circumstances of the Offenses Charged**

The circumstances of the offenses charged in this case overwhelmingly support detention. The seriousness of the offense with which the Defendant is charged cannot be overstated. The Defendant is currently charged by complaint with felony depredation of property, in a manner that

makes his act a Federal crime of terrorism under 18 U.S.C. §§ 1361 and § 2332b(g)(5)(B) for purposes of the BRA. That provision defines the term "Federal crime of terrorism" as an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B)(i) a violation of a listed offense which includes section 1361. *Id.* Here, there is ample evidence to support that the Defendant had such a calculated terroristic intent.

The Defendant's actions are extremely troubling. The Defendant travelled from St. Louis, Missouri to Washington, D.C. for the sole purpose of breaching the White House and seizing control of the government. By his own admission, he had been planning this action for six months. Almost immediately after the Defendant landed at Dulles airport, he proceeded to rent a U-Haul truck. He then drove towards the White House and rammed the barriers at Lafayette Park, a location where the north side of the White House is visible.

This attack was not a spur of the moment decision, it was a deliberate plan. Notwithstanding the factual impossibility of him accomplishing this act because of security measures in place to protect the U.S. Government and elected officials, the Defendant took significant, substantial steps towards accomplishing his goal.



*Figure 10, a photo from of the location of the attack, during the daytime, showing the visibility of the White House*

The Defendant's determination and deliberation are also demonstrated by his attempt to ram the barriers twice, only stopping when his vehicle had been disabled. His conscious and reckless disregard for human life is evidenced by the fact that he nearly ran over two pedestrians with his U-

14

Haul when he turned his vehicle off the road and drove over the raised curb onto the sidewalk. Simply put, the Defendant's dangerous actions placed himself, the civilians in the immediate vicinity, and law enforcement in significant danger. This combined with his stated purpose of overthrowing the government show the Defendant is an extreme danger to the public.

The charges faced by the Defendant are serious enough that the possible maximum term of imprisonment the Defendant faces upon conviction provides an incentive to flee. *See United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990). The Defendant faces up to ten years of imprisonment on the charge of a violation of 18 U.S.C. § 1361. Courts have repeatedly held that with serious charges and the possibility of considerable punishment comes "a substantial incentive to flee the United States." *See United States v. Vo*, 978 F. Supp. 2d 41, 43 (D.D.C. 2013) (finding detention appropriate for Defendant facing stiff penalties for bribery and visa fraud). Simply put, the Defendant has no incentive to appear before this Court and submit to the jurisdiction of the United States.

2. **The Weight of Evidence Against the Defendant**

The second factor to be considered, the weight of the evidence, also weighs in favor of detention.[2] The government's case against the Defendant is very strong. There is no question, that the Defendant rammed a U-Haul truck into the barriers at Lafayette Park and attempted to gain entry into the White House. The evidence is overwhelming, as the Defendant's actions were captured on

---

[2] While some judges in this Court have indicated that this factor should be given less weight, in *United States v. Blackson*, following a thorough review of the text of § 3142 and decisions analyzing this factor, Judge Beryl A. Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors." 2023 WL 1778194 (D.C. Feb. 6, 2023), at *8. Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10. In an unpublished opinion, the D.C. Circuit affirmed Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023). The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149-150 (2d Cir. 2022). This Court should follow *Blackson* and *Zhang;* this factor should be given no less weight than any other factor.

high resolution surveillance footage. His own statements indicate a calculated intent, that was not only verbalized to law enforcement, but documented in the Defendant's "green book." Moreover, the damage to the barriers is self-evident, as depicted in **Figures 11** and **12**.




*Figure 11*  *Figure 12*

Indeed, "[I]f the evidence against a defendant is overwhelming, credible, helpful, and important to the government's case in chief, that may increase the risk that defendant will flee to avoid future court proceedings and may indicate that the defendant is a present danger to himself or the community if the government's allegations later prove to be true." *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 at *10 (D.C. Cir. Mar. 28, 2023). This is such a case, and the Defendant should be detained pretrial.

3. **The History and Characteristics of the Defendant**

The Defendant's history and characteristics likewise support pretrial detention. While the Defendant has no criminal convictions of which the government is aware, his other circumstances support his detention. For example, the Defendant has no local ties to the community and no place of residence in Washington, D.C. He reported no stable income, only performing temporary "gig" jobs. He flew into Washington, D.C. from St. Louis hours before the attack and his sole purpose of being in Washington, D.C. was to carry out the attack. His last known residence is at his parents'

16

home in St. Louis, MO. According to initial records from the U.S. Department of State, the Defendant is not a U.S. citizen. He resides in the United States legally as a lawful permanent resident. With deportation a potential consequence of this matter, his incentive to flee the jurisdiction of the United States is great. According to available records, the Defendant has traveled to India in order to visit extended family, which also demonstrates a risk that the Defendant will flee the jurisdiction, especially considering the nature of the charges.

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

The Defendant's conduct on May 22, 2023, resoundingly demonstrates his dangerousness. This was not a spur of the moment crime, devoid of thought or reflection. Instead, this crime was deliberate, planned, and designed, in the Defendant's mind, to seize control of the government. Furthermore, although the Defendant was not found with any firearms or ammunition in this case, he turned the U-Haul into his weapon of choice. Given the combination of the Defendant's actions on that day and his professed intentions to commit additional violence, there are simply no conditions nor combinations of conditions of release that can assure the safety of the community if the Defendant is released. There are no facts which will rebut the presumption that no condition or combination of conditions will reasonably assure both the appearance of the person as required and the safety of the community.

**Conclusion**

Under the factors set forth in 18 U.S.C. § 3142(g), the government has demonstrated by clear and convincing evidence that the Defendant is a danger to the community and by preponderance of the evidence that he is a flight risk. For the foregoing reasons, as well as those that the government will demonstrate at any hearing on this matter, the government requests that the Court order the Defendant to be detained without bond pending resolution of this case.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052


*/s/ Alexander R. Schneider*
Alexander R. Schneider
Michigan Bar #P71467
Special Assistant United States Attorney
Email:  alexander.schneider@usdoj.gov
Phone:  (202) 252-7124

Shehzad Akhtar
D.C. Bar Number: 493635
Assistant United States Attorney
Email:  Shehzad.Akhtar@usdoj.gov
Phone: (202) 252-7498